# Third District Court of Appeal

## State of Florida

Opinion filed December 24, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D12-1101
Lower Tribunal No. 10-37321
_____

**St. Paul Fire & Marine Insurance Company,**
Appellant,

vs.

**Beatriz A. Llorente, etc.,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Jerald Bagley, Judge.

Fisher, Rushmer, Werrenrath, Dickson, Talley & Dunlap and Chris Ballentine (Orlando), for appellant.

Seiden, Alder, McLeod & Goodman and Wayne M. Alder (Boca Raton), for appellee.

Before SHEPHERD, C.J., and WELLS* and ROTHENBERG, JJ.

WELLS, Judge.

*Judge Wells did not participate in oral argument.

St. Paul Fire & Marine Insurance Company appeals the Final Summary Judgment entered in favor of Beatriz A. Llorente P.A. and Beatriz A. Llorente. The issue presented was whether an alleged negligent disbursement of funds by Llorente from her trust account was excluded from coverage under her Professional Liability Policy, which excluded "claims: . . . [a]rising out of the inability or failure to pay, collect, administer or safeguard funds held or to be held for others." The trial court found the exclusion inapplicable, we disagree. We reverse the order denying insurer St. Paul's motion for summary judgment and granting summary judgment in insured's favor.

We review interpretation of an insurance policy de novo. Am. Equity Ins. Co. v. Van Ginhoven, 788 So. 2d 388, 390 (Fla. 5th DCA 2001) ("Because the interpretation of an insurance contract is a question of law, this court is entitled to review the trial court's coverage determination de novo."). As this court has previously explained, "[i]f exclusions are clearly stated within an insurance policy, they will be upheld." Hawk Termite & Pest Control, Inc. v. Old Republic Ins. Co., 596 So. 2d 96, 97 (Fla. 3d DCA 1992); accord Van Ginhoven, 788 So. 2d at 390.

The exclusion at issue in this case could not be more clearly stated and excludes Llorente's claim. The policy at issue was issued to Llorente both as an attorney *and* as a title insurance agent and, as pertinent here, obligates St. Paul to pay damages arising out of any error, omission, or negligent act on Llorente's part

2

while rendering professional services. The policy does not, however, cover damages if Llorente erroneously or negligently pays or fails to pay any funds held by her or erroneously or negligently fails to keep safe or guard any funds held by her:

SECTION VI- EXCLUSIONS

This insurance does not apply to "claims"

. . .

L. Arising out of the inability or failure to pay, collect, administer or safeguard funds held or to be held for others.

Llorente, while acting as escrow agent during a real estate transaction, disbursed $1.5 million being held in her trust account before the conditions for release of those funds were met. The insurer claimed that this constituted a failure to safeguard the funds entrusted to Llorente, a circumstance excluded from coverage under the policy.

Llorente maintained that the term "safeguard" as used in the policy was ambiguous and therefore should be interpreted as requiring no more than protecting the funds from something undesirable happening to them such as conversion, misappropriation, or improper commingling, leading to a loss. We find this limited view of the term "safeguard" spurious, especially in light of the policy's exclusionary section VI A, which separately and specifically excludes such claims:

3

SECTION VI- EXCLUSIONS

This insurance does not apply to "claims"

A. Arising out of any dishonest, fraudulent, criminal or malicious act, error, omission or "personal injury" committed by, at the direction of an insured.

Interesting too, is the next sentence of section VI A:

This exclusion does not apply to an insured who did not personally commit or personally participate in committing any of the knowingly wrongful acts, errors, omissions or "personal injury" provided that: [insured had no notice] [upon notice, immediately contacted the insurer].

No similar forgiving language appears in the exclusionary section VI L. Rather, we find it clear that, as St. Paul argues, the failure to "safeguard" funds must include the act of negligently or wrongfully releasing the funds.

We reject Llorente's argument that "safeguard" is an ambiguous term. Thus, there is no need to read meaning into the term "safeguard" and no reason to require the insurer to cover a loss it expressly excluded from its policy coverage. See, e.g., Chicago Title Ins. Co. v. Northland Ins. Co., 31 So. 3d 214, 216 (Fla. DCA 2010) (stating that "semantics cannot avoid the obvious").

We see no reason why Llorente and St. Paul's definition of the word "safeguard" do not both easily fall under the definition of safeguard.[1] Whether

---

[1] The fact that an apple and a banana are both "fruits" does not make the term "fruit" ambiguous.

4

stolen or wrongfully disbursed, there was a failure to *safeguard* the $1.5 million at issue, i.e. keep it safe until disbursement was properly authorized. When this attorney/escrow agent/fiduciary disbursed the funds before the preconditions to the release of those funds had been met there is no question that she failed to guard and keep safe the funds entrusted to her. See SO5 501, LLC v. Metro-Dade Title Co., 109 So. 3d 1192, 1194 (Fla. 3d DCA 2013) (acknowledging the fiduciary duty owed by escrow agents); Watkins v. NCNB Nat. Bank of Florida, N.A., 622 So. 2d 1063, 1064 (Fla. 3d DCA 1993); Williams v. Hunt Bros. Constr., Inc., 475 So. 2d 738, 741 (Fla. 2d DCA 1985) ("A fiduciary, be he an attorney or not, must account for and deliver over property or money of a beneficiary, client, or third party which has been entrusted to him for a particular purpose and which he was required to have held in trust."); see also United Am. Bank of Cent. Fla., Inc. v. Seligman, 599 So. 2d 1014, 1017 (Fla. 5th DCA 1992) (concluding that an escrow agent breached his duty when he disbursed escrowed funds directly to his client, rather than the bank which had become third-party beneficiary to client's rights by virtue of assignment of client's interests in the escrow funds).

Llorente cites to Flint-Lambert, P.C. v. Gulf Ins. Co., 2005 WL 2042062, *1 (N.D. Tex. Aug. 25, 2005). However that case supports St. Paul's rather than Llorente's position. Flint-Lambert is a law firm. It provided improper wiring instructions from which its title company client disbursed escrow payments from

5

real estate transactions. After the title company made good the erroneous payment made pursuant to Flint-Lambert's instructions, it demanded that Flint-Lambert reimburse it. Flint-Lambert then made a claim with Gulf, its insurer, to recover on this loss. Gulf denied the claim because although Gulf's policy provided that Gulf would pay on behalf of Flint-Lambert damages arising out of an error, omission, or negligent act while rendering or failing to render professional legal services, Flint-Lambert's claim was excluded from coverage under the same provision at issue here.[2]

While the dispute in <u>Flint-Lambert</u> centered on the same exclusionary language at issue here, the case did not turn on the meaning of "safeguard." Rather, that case turned on whether the exclusion applied only to the loss of funds held by Flint-Lambert (the insured) itself, or to the loss of funds held by a third party, there the title company:

> [Insurer] reads the provision to exclude claims arising out of [insured's] inability or failure to administer or safeguard funds irrespective of who held the funds; [insured], on the other hand, reads the provision to exclude claims arising out of its inability or failure to administer or safeguard funds held by [insured] for others.

<u>Flint-Lambert</u>, 2005 WL 2042062 at 2.

---

[2] The policy in Flint-Lambert, like the one at issue here, excluded claims "[a]rising out of the inability or failure to pay, collect, administer, safeguard, funds held or to be held for others." <u>Id.</u> at *1 (emphasis added).

6

To be sure, no one in that case argued the exclusionary language was inapplicable to a case where the funds were mistakenly or erroneously (as was the case there) released. Rather, the conflict and ambiguity in that case was found in who had to be in possession of the funds in order to make the provision applicable. No such question exists here.

Likewise, Llorente cites to <u>Murray v. Greenwich Ins. Co.</u>, 533 F.3d 644, 650 (8th Cir. 2008), as a case with similar exclusionary policy language to support the conclusion that the exclusion here does not apply.[3] However, <u>Murray</u> supports no such conclusion and holds nothing more than a "failure to return the entrusted deposits" triggers application of the exclusion:

> Each of the claims asserted within the underlying complaint, either directly or by incorporation, allege an injury originating from, or having its origin in, growing out of, or flowing from the failure to return the deposited funds. "But for" the failure to refund those deposits as promised, there would have been no claims. In other words, had the funds not been mishandled the claims alleged in the

[3] There, as here, the policy excluded coverage for claims arising out of the inability or failure to safeguard funds held for others:

Exclusion D excludes coverage for claims:

D. based on or arising out of:

. . . .

3. the inability or failure to pay, collect or safeguard funds held for others.

<u>Murray</u>, 533 F.3d at 647.

complaint would not have arisen.  Thus, each of the claims is causally connected to and arose out of the failure to return the entrusted deposits.  Accordingly, we conclude the exclusion applies and [the insurer] has no duty to defend.

Murray, 533 F. 3d at 650 (citation omitted).[4]

In sum, we conclude that this claim falls squarely within the policy exclusion providing that there is no coverage for any claims "arising out of the inability or failure to pay, collect, administer or safeguard funds held or to be held for others."  Llorente did not "safeguard" the $1.5 million entrusted to her when she disbursed that sum before she was authorized to do so.  The trial court's decision is reversed and the case remanded for entry of summary judgment in St. Paul's favor, resulting in no coverage for Llorente.

ROTHENBERG, J., concurs.

---

[4] As to Five Star Real Estate, LLC v. Kemper Cas. Ins. Co., 2006 WL 1294238, *2 (Mich. Ct. App. 2006), cited by the dissent, we find the facts of that case too far afield from the allegations herein to be persuasive in any manner.

SHEPHERD, C.J., dissenting.

The question on this appeal is whether an attorney who is alleged to have negligently disbursed $1.5 million from an escrow account for which she was responsible, has also failed to "safeguard" those funds within the meaning of an exclusion from coverage, appearing in a Lawyers Professional Liability Insurance Policy, which excludes "claims: . . . [a]rising out of the inability or failure to pay, collect, administer or safeguard funds held or to be held for others." (emphasis added). The intuitive answer to the question is "yes." However, as the following discussion will demonstrate, it is dangerous to intuit the law.

The insurance policy in this case was issued by St. Paul Fire & Marine Insurance Company to Beatriz Llorente. The policy insured Llorente both as an attorney and title insurance agent. The policy's insuring agreement obligates St. Paul to pay "damages" which "arise out of an error, omission, negligent act or 'personal injury' in the rendering of or failure to render 'professional legal services' for others by you or on your behalf." In a separate action, HBR Realty, LLC alleges wrongful conduct by Llorente in her capacity as a closing and escrow agent for a real estate transaction by improperly releasing $1.5 million from her trust account before conditions precedent occurred. For purpose of this coverage

9

determination, Llorente's negligence is assumed. U.S. Fire Ins. Co. v. Hayden Bonded Storage Co., 930 so. 2d 686, 691 (Fla. 4th DCA 2006) ("If the complaint sets forth facts which bring the claim within the policy coverage, [a] duty to defend arises.").

St. Paul asserts loss is excluded from coverage under Section VI L of the insurance policy. This section of the policy reads as follows:

SECTION VI – EXCLUSIONS

This insurance does not apply to "claims":

…

L. Arising out of the inability or failure to pay, collect, administer or safeguard funds held or to be held for others.


(emphasis added).

The term "safeguard," as used within Section VI L of the policy, is not defined. Llorente argues that "safeguard" simply means to protect funds against something undesirable happening to them, such as theft, conversion, misappropriation, or improper commingling, leading to a loss. Support for her position is found in the dictionary definition of safeguard and even in the legal definition of synonymous words, such as "safekeeping." See The American Heritage Dictionary of the English Language 1142 (William Morris ed., 1979)

10

("safeguard … –tr.v. … [t]o insure the safety of; to guard; protect. See Synonyms at defend."); see also Black's Law Dictionary 1453 (9th ed. 2009) ("safekeeping. 1. The act of protecting something in one's custody. 2. Under the Securities Investors Protection Act, the holding of a security on behalf of the investor or broker that has paid for it."). St. Paul, on the other hand, urges that a wrongful disbursement of the funds is also included.

The majority reasons that because, in its mind, both parties' definition of the word "safeguard" could "easily fall under the definition of safeguard," the exclusion applies. The reasoning of the majority begs the question. The parties in this case contend for opposing interpretations of the operative exclusionary language. These proposals are no more compatible with each other than a briar and a rose. However, even if the majority's reasoning is correct, coverage nevertheless exists. See Washington Nat. Ins. Corp. v. Ruderman, 117 So. 3d 943, 948 (Fla. 2013) ("[P]olicy language is considered to be ambiguous ... if the language 'is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage.'") (quoting State Farm Mut. Auto. Ins. Co. v. Menendez, 70 So. 3d 566, 570 (Fla. 2011)); Travelers Indem. Co. v. PCR Inc., 889 So. 2d 779, 785 (Fla.2004); Swire Pacific Holdings Inc. v. Zurich Ins. Co., 845 So. 2d 161, 165 (Fla. 2003); Cheetham v. Southern Oak Ins. Co., 114 So. 3d 257, 261 (Fla. 3d DCA 2013) ("[I]f the salient policy language is susceptible to

11

two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous.") (quoting Fayad v. Clarendon Nat. Ins. Co., 899 So. 2d 1082, 1086 (Fla. 2005)); East Fla. Hauling, Inc. v. Lexington Ins. Co., 913 So. 2d 673, 676 (Fla. 3d DCA 2005) ("[I]f the language of the policy is susceptible to more than one reasonable interpretation, it is ambiguous, and a court will resolve such ambiguity in favor of the insured."). I would find, as did the learned trial judge, that the meaning of the word "safeguard," found in the exclusion, is ambiguous as applied to the facts of this case.

Such a finding, of course, precipitates a host of interpretive rules adverse to the insurer. Perhaps most pertinent here is the rule that "where the language in an insurance policy is subject to differing interpretations, the policy language 'should be construed liberally in favor of the insured and strictly against the insurer.'" Flores v. Allstate Ins. Co., 819 So. 2d 740, 744 (Fla. 2002) (citing State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So. 2d 1072, 1076 (Fla. 1998)); see also Williamson v. Nurses' Mut. Protective Corp., 194 So. 643, 644 (Fla. 1940) ("We are aware of the rule approved by this court that in studying and construing insurance policies every effort should be bent to give force to all of the provisions contained and that in the event of ambiguities the insured will be favored over the insurer so that liberality will be indulged for the insured or for the larger indemnity"). "This is particularly true in interpreting exclusionary clauses,

which are to be construed even more strictly than coverage clauses." Triano v. State Farm Mut. Auto. Ins. Co., 565 So. 2d 748, 749 (Fla. 3d DCA 1990).

The closest case which actually interprets the same exclusion at issue in this case that the parties have found, or that I have found through the use of electronically assisted research, is Flint-Lambert, P.C. v. Gulf Ins. Co., 2005 WL 20422062 (N.D. Tex. 2005) (unpublished). The underlying action in Flint-Lambert was a claim for indemnity brought by a real estate title company against its law firm, Flint-Lambert, P.C., to recover a loss incurred when the company disbursed escrow funds held by it based upon erroneous wiring instructions received from the law firm. The lawyer malpractice insurance policy, issued by Gulf Insurance Company to Flint-Lambert, contained the identical "funds handling" exclusion as does the policy issued by St. Paul to Llorente in our case. In Flint-Lambert, Gulf Insurance read the provision to exclude claims arising out of the law firm's inability or failure to administer or safeguard funds irrespective of who held the funds. The title company urged a narrower interpretation of the policy, arguing that by its terms the exclusion operated to exclude only claims arising out of funds "held by" the law firm or "to be held" by the law firm. The United States District Court concluded that both parties' interpretations were reasonable, and therefore, provision L of the Gulf Insurance policy was

13

ambiguous. The Court found coverage to exist in favor of the third-party claimant title company.

Although the ambiguity in the case before us arises out of a different factual scenario, the claimant in the underlying legal malpractice case is also a third-party claimant. The underlying claim falls within the language of the insuring agreement. "It has long been a tenet of Florida insurance law that an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer." Berkshire Life Ins. Co. v. Adelberg, 698 So. 2d 828, 830 (Fla. 1997). Under St. Paul's interpretation of "safeguard," any loss of funds through any act of negligence of an insured attorney or title insurance agent acting in her capacity as a closing and escrow agent would not be covered under the insurance policy. Like the Flint-Lambert court, I would decline to approve such a broad interpretation of provision L.

Conclusion

When all is said and done, it appears the majority has conflated the negligence claims made by HBR Realty, LLC against Llorente in the underlying liability case with the contractual question raised by the handling of funds exclusion in this declaratory judgment case. The first is a given for purposes of the coverage analysis in this case. The latter is a matter of contract interpretation

14

with all the presumptions and adverse canons of constructions appurtenant thereto in the often separate and sometimes arcane world of insurance coverage law.

I would affirm the judgment of the trial court.